# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP2548-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |      Plaintiff-Respondent, |
| |   v. |
| | Luis M. Rocha-Mayo, |
| |      Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
348 Wis. 2d 262, 831 N.W.2d 824
(Ct. App. 2013 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 11, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 4, 2014 |

| SOURCE OF APPEAL: | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Kenosha |
| JUDGE: | Wilbur W. Warren III |

| JUSTICES: | |
|---|---|
| CONCURRED: | ZIEGLER, ROGGENSACK, GABLEMAN, JJJ., concur. (Opinion filed.) |
| DISSENTED: | ABRAHAMSON, C.J. dissents. (Opinion filed.) PROSSER, J., ABRAHAMSON, C.J., BRADLEY, J., dissent. (Opinion filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs by *Rex R. Anderegg* and *Anderegg & Associates*, Milwaukee, and oral argument by *Rex R. Anderegg*.

For the plaintiff-respondent, the cause was argued by *Sally L. Wellman*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2011AP2548-CR
(L.C. No. 2008CF660)

STATE OF WISCONSIN        :      IN SUPREME COURT

**State of Wisconsin,**

     **Plaintiff-Respondent,**

  **v.**

**Luis M. Rocha-Mayo,**

     **Defendant-Appellant-Petitioner.**

**FILED**

**JUL 11, 2014**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 N. PATRICK CROOKS, J. This is a review of an unpublished court of appeals decision that upheld Luis M. Rocha-Mayo's convictions for first-degree reckless homicide by use of a dangerous weapon, homicide by intoxicated use of a vehicle, first-degree reckless endangerment by use of a dangerous weapon, and operating a motor vehicle without a valid license causing death to another person.[1] The convictions stem from a high-speed collision involving Rocha-Mayo's car and two motorcycles. The

---

[1] State v. Rocha-Mayo, No. 2011AP2548-CR, unpublished slip op. (Wis. Ct. App. Apr. 24, 2013).

collision resulted in the death of one motorcyclist as well as injuries to Rocha-Mayo.

¶2 During trial, the State introduced the preliminary breath test (PBT) result obtained from Rocha-Mayo by an emergency room (ER) nurse for diagnostic purposes. The Kenosha County Circuit Court, the Honorable Wilbur W. Warren III presiding, utilized Wis JI——Criminal 1185[2] in instructing the

---

[2] Wisconsin JI——Criminal 1185 addresses the charge of "Homicide by Operation of a Vehicle While Under the Influence." Utilizing a slightly modified version of the instruction, the circuit court instructed the jury, in part,

> If you are satisfied beyond a reasonable doubt that there was .08 grams or more of alcohol in 210 liters of the defendant's breath at the time the test was taken, you may find that the defendant was under the influence of an intoxicant at the time of the alleged operating, but you are not required to do so. You the jury are here to decide this question on the basis of all the evidence in this case, and you should not find that the defendant was under the influence of an intoxicant at the time of the alleged operating, unless you are satisfied of that fact beyond a reasonable doubt.

In contrast, the same passage from the standard Wisconsin JI——Criminal 1185 provides,

> If you are satisfied beyond a reasonable doubt that there was .08 grams or more of alcohol in 210 liters of the defendant's breath at the time the test was taken, you may find from that fact alone that the defendant was under the influence of an intoxicant at the time of the alleged operating, but you are not required to do so. You the jury are here to decide this question on the basis of all the evidence in this case, and you should not find that the defendant was under the influence of an intoxicant at the time of the alleged operating, unless you are satisfied of that fact beyond a reasonable doubt.

2

jury on the PBT result.  Over Rocha-Mayo's objection, the State also offered testimony from Dr. William Falco, an ER physician who treated Rocha-Mayo.  The physician testified that Rocha-Mayo appeared to be intoxicated at the time he was undergoing treatment in the ER.

¶3  Rocha-Mayo asks this court to review three issues. First, whether Wisconsin statutes governing breath alcohol testing allow admission of a PBT result as evidence of intoxication in operating while intoxicated (OWI) related trials when the results are not obtained by law enforcement.  Second, whether the circuit court improperly instructed the jury in regard to the PBT result.  Third, whether the circuit court erred in allowing an ER physician to testify that Rocha-Mayo appeared intoxicated while being treated in the ER.  The State asserts that the circuit court did not err in any regard.  In the alternative, the State contends that any circuit court error was harmless.

¶4  Since we conclude that this case can and should be resolved by application of a harmless error analysis, we assume, without deciding, that the circuit court erred when it allowed the State to admit, as evidence, the PBT result obtained by a medical professional for diagnostic purposes.  Likewise, we assume, without deciding, that the circuit court erred under these circumstances in utilizing Wis JI——Criminal 1185 to instruct the jury on its use of the PBT evidence.  We conclude,

---

(Emphasis added.)

3

however, that the circuit court did exercise appropriate discretion when it allowed Dr. Falco to testify that, based on his observations and medical experience, Rocha-Mayo was intoxicated while undergoing treatment in the ER. We agree with the court of appeals that "[t]he legal concept at issue was whether Rocha-Mayo was under the influence of an intoxicant at the time he operated the motor vehicle."[3] Dr. Falco's testimony related only to his observations of Rocha-Mayo in the ER, and he did not testify about Rocha-Mayo's driving ability on the night of the accident. In fact, Dr. Falco specifically testified that he could not give any indication of Rocha-Mayo's level of intoxication at the time of the accident.

¶5 Although we assume without deciding that the circuit court erred in admitting the PBT result as evidence and in instructing the jury in regard to the PBT, we conclude that these alleged errors were harmless beyond a reasonable doubt. Even without the PBT evidence, the jury heard evidence of Rocha-Mayo's level of intoxication from witnesses and from Rocha-Mayo himself. Rocha-Mayo admitted that he consumed two or three beers at home and an additional five or six beers at a bar, and that he was drinking alcohol in his car just prior to the collision. Dr. Falco and Steven Edwards, an ER nurse, testified that they could smell alcohol on Rocha-Mayo's breath in the ER. Finally, Dr. Falco testified that Rocha-Mayo appeared to be

---

[3] State v. Rocha-Mayo, No. 2011AP2548-CR, unpublished slip op., ¶15 (Wis. Ct. App. Apr. 24, 2013).

intoxicated while being treated in the ER. We therefore conclude, beyond a reasonable doubt, that any error by the circuit court did not contribute to the verdict.

## I. Background

¶6 At trial, the facts leading up to the collision were disputed. We discuss only those facts relevant to our decision.

¶7 On June 22, 2008, Rocha-Mayo left El Rodeo,[4] a bar in Kenosha, Wisconsin, at approximately 2:00 a.m., around the time of the bar's closing.[5] He left the bar in his vehicle and started traveling west on 52nd Street. Shortly after leaving the bar, Rocha-Mayo encountered three motorcyclists. One of the motorcycles in the group also carried a passenger.

¶8 At that point, the descriptions of what happened diverge; however, a road-rage type incident unfolded in which Rocha-Mayo and the motorcyclists were driving within close proximity to one another. At one point one of the motorcyclists threw a metal baton through Rocha-Mayo's rear window. The motorcycle carrying two people turned off of 52nd Street. The other two motorcyclists and Rocha-Mayo continued traveling on 52nd Street at high rates of speed upwards of 70 miles per hour (mph).

---

[4] Rocha-Mayo also referred to this bar in a statement to police and during his testimony as "Alas de Oro" and "Oro."

[5] The bar's owner and Rocha-Mayo testified that he left around bar closing time, which occurs at 2:30 a.m. However, police reports and witness accounts of the accident suggest that Rocha-Mayo left the bar closer to 2:00 a.m.

¶9   At the intersection of 52nd Street and Green Bay Road, Rocha-Mayo's vehicle struck one of the motorcycles.  That motorcyclist later died of his injuries.  The other motorcyclist was uninjured and left the scene of the accident.  Rocha-Mayo also sustained injuries and was taken to St. Catherine's Medical Center.

¶10  Dr. Falco and Edwards attended to Rocha-Mayo in the ER and examined him for a possible head injury.  Dr. Falco and Edwards both testified that they could smell alcohol on Rocha-Mayo's breath.  Dr. Falco also testified that he observed Rocha-Mayo talking rapidly on his phone upon arrival, and that Rocha-Mayo had a diminished memory of the accident.  Rocha-Mayo also told Dr. Falco that he had been drinking alcohol.

¶11  Due to these observations, Dr. Falco ordered Edwards to test Rocha-Mayo's breath for the presence of alcohol to determine whether Rocha-Mayo's symptoms might be alcohol-related.  Edwards performed the PBT and recorded a result of 0.086.[6]

¶12  Rocha-Mayo sought to exclude the PBT test result from his trial.  He argued that Wis. Stat. § 343.303[7] prohibits the use of PBT results in OWI-related trials.  The circuit court

---

[6] Since 2003, the legal limit for driving in Wisconsin has been 0.08 BAC.  See Wis. Stat. § 346.63; 2003 Wis. Act 30, § 1. However, Wis. Stat. § 346.63(1)(a) generally prohibits driving under the influence of any intoxicant, which "renders him or her incapable of safely driving . . . ."

[7] This and all subsequent references to the Wisconsin statutes are to the 2007-08 version unless otherwise indicated.

denied his motion to suppress the result. The circuit court reasoned that Wis. Stat. § 343.303 must be read in its entirety, and that the plain language of the statute applies to PBT results obtained by law enforcement. Therefore, the circuit court found that the PBT result was admissible because it was taken by a medical professional for diagnostic purposes. In addition, the PBT was not taken at the direction of, or at the request of, law enforcement. The circuit court pointed out that no law enforcement officers were present in the ER at the time Edwards administered the PBT.

¶13 Rocha-Mayo proceeded to trial on the charges of first-degree reckless homicide by use of a dangerous weapon, homicide by intoxicated use of a vehicle, and first-degree reckless endangerment by use of a dangerous weapon. Before trial, he pleaded guilty to the charge of operating a motor vehicle without a valid license causing death to another person.

¶14 At trial, the State presented several witnesses who observed the motorcyclists and Rocha-Mayo on 52nd Street prior to the collision. These witnesses consistently estimated that the vehicles were traveling upwards of 70 mph. A police officer on patrol observed the vehicles just prior to the accident and testified that all three were driving "recklessly and at a high rate of speed" that he estimated as between 70 and 80 mph.

¶15 The State also elicited other testimony regarding Rocha-Mayo's level of intoxication. A police officer who obtained a statement from Rocha-Mayo read the statement during her trial testimony. In this statement Rocha-Mayo admitted to

7

drinking three beers at his home between 7 p.m. and 9 p.m. before going to El Rodeo, where, he admitted, he drank another six beers.[8] Rocha-Mayo's statement also provided information that he purchased two six-packs of beer from the bar as he left and that he continued to drink an open beer in his car as he drove away from the bar. A third officer testified that he inspected Rocha-Mayo's car following the accident and that he observed one empty beer bottle and five full beer bottles scattered on the front floorboard of the car.

¶16 The State also called El Rodeo's owner, who worked as a bartender on the night in question, as a witness. She testified that she did not recall serving alcohol to Rocha-Mayo and that she could not remember selling him any packaged alcohol. On cross-examination, the bar owner testified that Rocha-Mayo did not appear to be intoxicated, but she then admitted that her recollection of the evening was poor. When pressed, she testified that she did not recall Rocha-Mayo exhibiting any obvious signs of intoxication, such as falling down.

¶17 The State also presented testimony from Dr. Falco and Edwards who both testified that they could smell alcohol on Rocha-Mayo's breath. In addition, Dr. Falco testified that, in

---

[8] Rocha-Mayo testified at trial. His testimony was largely consistent with his prior statement to police. He testified that he drank two or three beers at home and then consumed an additional five or six beers at the bar.

his professional opinion, Rocha-Mayo was intoxicated at the time he was treated in the ER.

¶18 A jury found Rocha-Mayo guilty of all charges.[9]

¶19 The court of appeals affirmed. Like the circuit court, it found that the plain language of Wis. Stat. § 343.303 applies only to PBT results obtained by law enforcement. It concluded that the circuit court's decision to allow the PBT result was a proper exercise of discretion. The court of appeals also rejected Rocha-Mayo's argument that the circuit court erred in utilizing Wis JI——Criminal 1185 when instructing the jury that it could rely on the PBT result as evidence of intoxication because the instruction allowed, but did not require, the jury to find that the defendant was under the influence of an intoxicant at the time of the alleged operating. Finally, the court of appeals found that Dr. Falco's testimony, that Rocha-Mayo appeared intoxicated while in the ER, was not error because he offered no opinion on Rocha-Mayo's state of intoxication at the time of the accident.

¶20 This case presents four issues. First, whether Wis. Stat. § 343.303 prohibits the admission of a PBT test result obtained by a medical professional in an OWI-related trial. Second, whether the circuit court erred in utilizing Wis JI—— Criminal 1185 to instruct the jury on its use of the PBT evidence. Third, whether Dr. Falco's testimony, that Rocha-Mayo

---

[9] As previously noted, Rocha-Mayo had pleaded guilty to the charge of operating a motor vehicle without a valid license causing death to another person prior to his trial.

was intoxicated while in the ER, was improper because it embraced a "legal concept for which a definitional instruction was required." Finally, whether circuit court error, if any, was harmless.

¶21 We assume without deciding that the circuit court erred when it admitted the PBT result and instructed the jury on that result. Therefore, we first address whether the circuit court erred in allowing Dr. Falco's testimony. We then turn to the parties' harmless error arguments.

## II. Standard of Review

¶22 We review a prior court's admission of evidence under the erroneous exercise of discretion standard. State v. Doss, 2008 WI 93, ¶19, 312 Wis. 2d 570, 754 N.W.2d 150. That means we will not overturn the prior court's determination unless there is a clear showing of such discretion having been exercised in an erroneous manner. Id. "A proper exercise of discretion requires that the circuit court rely on facts of record, the applicable law, and, using a demonstrable rational process, reach a reasonable decision." Id.

¶23 Our harmless error analysis requires us to determine whether the error in question affected the jury's verdict. State v. Weed, 2003 WI 85, ¶29, 263 Wis. 2d 434, 666 N.W.2d 485. Therefore, we ask, "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" State v. Harvey, 2002 WI 93, ¶46, 254 Wis. 2d 442, 647 N.W.2d 189 (quoting Neder v. U.S., 527 U.S. 1, 18 (1999)).

### III. Analysis

#### A. Admissibility of Dr. Falco's Testimony

¶24 Rocha-Mayo argues that the circuit court erred when, over his objection, it allowed Dr. Falco to testify that, in his expert opinion, Rocha-Mayo was intoxicated at the time he was treated in the ER. Rocha-Mayo's argument is that Dr. Falco's testimony was improper because it "embraced a legal concept for which a definitional instruction was required." The legal concept to which Rocha-Mayo refers is the definition of "under the influence of an intoxicant," which was one element of the charge of homicide by intoxicated use of a vehicle. As to this charge, the circuit court instructed the jury, "The third element is the defendant was under the influence of an intoxicant <u>at the time the defendant operated a vehicle</u>. 'Under the influence of an intoxicant' means that the defendant's ability to operate a vehicle was materially impaired because of consumption of an alcoholic beverage." (Emphasis added.)

¶25 In contrast, the State argues that Dr. Falco never offered any opinion as to Rocha-Mayo's condition or level of intoxication at the time of the accident. In fact, the State points out that Dr. Falco specifically testified that he could not make any judgment as to Rocha-Mayo's blood alcohol content at the time he operated his vehicle or his ability to operate a vehicle.

¶26 Wisconsin Stat. § 907.04 governs "opinion on ultimate issue." It states, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it

11

embraces an ultimate issue to be decided by the trier of fact." Wis. Stat. § 907.04.   Both parties agree that Dr. Falco's testimony was permissible under Wis. Stat. § 907.04.   However, Rocha-Mayo argues that the circuit court erred in allowing Dr. Falco to testify in regard to his level of intoxication because the definitional instruction for "under the influence of an intoxicant" was required.

¶27  The court of appeals has explained that the "ultimate issue" described in Wis. Stat. § 907.04 cannot "be one that is a legal concept for which the jury needs definitional instructions."  Lievrouw v. Roth, 157 Wis. 2d 332, 351-52, 459 N.W.2d 850 (1990).

¶28  Here, we conclude that Dr. Falco's testimony complies with both Wis. Stat. § 907.04 and Lievrouw.  This is because the ultimate issue at stake was whether Rocha-Mayo was intoxicated at the time of the collision.  Furthermore, a significant part of the defense was that even if Rocha-Mayo was intoxicated while driving, the accident would have occurred regardless of that fact.[10]

¶29  Dr. Falco's testimony was permissible because it did not embrace the ultimate issue: whether Rocha-Mayo was

---

[10] As we noted previously, Wis JI——Criminal 1185, addresses the charge of "Homicide by Operation of a Vehicle While Under the Influence."  From this instruction the jury was told, "Wisconsin law provides that it is a defense to this crime if the death would have occurred even if the defendant had been exercising due care and had not been under the influence of an intoxicant."  Wis JI——Criminal 1185.

intoxicated at the time of the accident. As previously noted, Dr. Falco's testimony related only to his belief that Rocha-Mayo was intoxicated while undergoing treatment in the ER. Furthermore, Dr. Falco did not give any opinion as to Rocha-Mayo's ability to drive his vehicle safely. In fact, on cross-examination Rocha-Mayo's counsel specifically asked Dr. Falco if he could opine on Rocha-Mayo's level of intoxication at the time of the accident. After explaining that Rocha-Mayo's blood alcohol level on the night of the accident would have fluctuated depending on the rate his body metabolized the alcohol, Dr. Falco responded, "I cannot." Therefore, we conclude that the circuit court acted appropriately within its discretion when it allowed Dr. Falco to testify about Rocha-Mayo's state of intoxication while he was being treated in the ER.

## B. Harmless Error

¶30 Rocha-Mayo argues that any circuit court error related to the PBT evidence or the instruction to the jury regarding the PBT results cannot be harmless error. We disagree. While we assume without deciding that admission of the PBT result and the jury instruction at issue was error, we conclude that these errors were harmless beyond a reasonable doubt. In other words, we conclude that admission of the PBT result and the use of Wisconsin JI——Criminal 1185, in regard to the PBT evidence, did not affect the jury's verdict. It is clear beyond a reasonable doubt that the jury would have found the defendant guilty absent the alleged errors.

¶31 Under Wisconsin statutes and precedent, harmless error analysis is applicable to this case. Wisconsin Stat. § 805.18(2) provides,

> No judgment shall be reversed or set aside or new trial granted in any action or proceeding <u>on the ground of</u> . . . <u>the improper admission of evidence</u> . . . unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

(Emphasis added.) Although Wis. Stat. § 805.18 specifically applies to civil procedure, this statute is applicable to criminal proceedings through Wis. Stat. § 972.11(1).[11] Harvey, 254 Wis. 2d 442, ¶39.

¶32 In Harvey, this court addressed the application of harmless error analysis in the context of a challenged jury instruction. Id., ¶6. In doing so, we relied heavily on Neder, 527 U.S. 1. Id., ¶¶35-46. In considering the language of Wis. Stat. § 805.18, we also relied on the following question when conducting harmless error analysis: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" Harvey, 254 Wis. 2d 442, ¶46 (quoting Neder, 527 U.S. at 18).

---

[11] The applicable portion of Wis. Stat. § 972.11(1) provides, "Except as provided in subs. (2) to (4), the rules of evidence and practice in civil actions shall be applicable in all criminal proceedings unless the context of a section or rule manifestly requires a different construction." Subsections (2)-(4) are not applicable to this case.

14

¶33 The following year we again found guidance from Harvey and Neder in discussing harmless error analysis in the context of an alleged confrontation clause violation. Weed, 263 Wis. 2d 434, ¶29. In doing so, we again relied on the harmless error test set forth in Harvey. Id. (citing Harvey, 254 Wis. 2d 442, ¶44).

¶34 Assuming, without deciding, that the circuit court erred when it allowed admission of the PBT result and the corresponding jury instruction, we conclude that such alleged errors were harmless. This is because the jury heard ample evidence to conclude that Rocha-Mayo was intoxicated at the time of the accident.

¶35 First, while speed is not necessarily indicative of intoxication, the jury heard from multiple witnesses who all testified that Rocha-Mayo and the motorcyclists were driving recklessly and traveling at high rates of speed. Witnesses consistently estimated that the vehicles were travelling between 70 and 80 mph along 52nd Street. At the point where a patrol officer observed the vehicles, the posted speed limit on 52nd Street was 30 mph.

¶36 In addition, the jury heard evidence of Rocha-Mayo's level of intoxication. First, the jury heard Rocha-Mayo's statement to police in which he admitted to drinking three beers at his home between 7 p.m. and 9 p.m. His statement also provided that he arrived at El Rodeo around 9 p.m. and that he consumed an additional six beers before purchasing two six-packs of beer from the bar as he left. His statement and his

15

testimony at trial was that he carried a partially consumed bottle of beer to his car and finished that beer while driving his vehicle.[12] Rocha-Mayo's statements were confirmed in part by a police officer who testified that he examined Rocha-Mayo's vehicle after the accident. This officer found one empty bottle of beer and five unopened bottles in Rocha-Mayo's vehicle.

¶37 The jury also heard testimony from Dr. Falco and Edwards who both attended to Rocha-Mayo in the ER. Rocha-Mayo told Dr. Falco that he had been drinking alcohol immediately prior to the collision. Dr. Falco and Edwards both testified that they could smell alcohol on Rocha-Mayo's breath. In addition, Dr. Falco testified that, based on his observations and experience, Rocha-Mayo was intoxicated while undergoing treatment in the ER.[13]

¶38 Due to other evidence of Rocha-Mayo's intoxication, we conclude, beyond a reasonable doubt, that admission of the PBT result and the related jury instruction did not affect the jury's verdict. Therefore, assuming, without deciding, that admission of the PBT evidence and use of the corresponding jury instruction were error, we conclude that those alleged errors were harmless beyond a reasonable doubt.

---

[12] Rocha-Mayo testified that the beer he finished in his car was part of the estimated five or six beers that he consumed at the bar.

[13] As noted previously, El Rodeo's owner testified that she could not recall serving or selling alcoholic beverages to Rocha-Mayo. She admitted, however, that her memory of that night was poor.

IV. Conclusion

¶39 This case can and should be resolved by application of a harmless error analysis. We assume, without deciding, that the circuit court erred when it allowed the State to admit, as evidence, the PBT result obtained by a medical professional for diagnostic purposes. Likewise, we assume, without deciding, that the circuit court erred under these circumstances in utilizing Wis JI——Criminal 1185 to instruct the jury on its use of the PBT evidence. We conclude, however, that the circuit court did exercise appropriate discretion when it allowed Dr. Falco to testify that, based on his observations and medical experience, Rocha-Mayo was intoxicated while undergoing treatment in the ER. We agree with the court of appeals that "[t]he legal concept at issue was whether Rocha-Mayo was under the influence of an intoxicant at the time he operated the motor vehicle."[14] Dr. Falco's testimony related only to his observations of Rocha-Mayo in the ER, and he did not testify about Rocha-Mayo's driving ability on the night of the accident. In fact, Dr. Falco specifically testified that he could not give any indication of Rocha-Mayo's level of intoxication at the time of the accident.

¶40 Although we assume, without deciding, that the circuit court erred in admitting the PBT result as evidence and in instructing the jury in regard to the PBT, we conclude that

---

[14] State v. Rocha-Mayo, No. 2011AP2548-CR, unpublished slip op., ¶15 (Wis. Ct. App. Apr. 24, 2013).

these alleged errors were harmless beyond a reasonable doubt. Even without the PBT evidence, the jury heard evidence of Rocha-Mayo's level of intoxication from witnesses and from Rocha-Mayo himself. Rocha-Mayo admitted that he consumed two or three beers at home and an additional five or six beers at a bar and that he was drinking alcohol in his car just prior to the collision. Dr. Falco and Steven Edwards, an ER nurse, testified that they could smell alcohol on Rocha-Mayo's breath in the ER. Finally, Dr. Falco testified that Rocha-Mayo appeared to be intoxicated while being treated in the ER. We therefore conclude, beyond a reasonable doubt, that any error by the circuit court did not contribute to the verdict.

*By the Court.*—The decision of the court of appeals is affirmed.

¶41 ANNETTE KINGSLAND ZIEGLER, J. *(concurring).* I join the majority opinion. I concur and write separately to go further than the majority opinion and conclude that the plain language of Wis. Stat. § 343.303 "expressly bars" admission of preliminary breath test ("PBT") results in trials which involve operating a motor vehicle under the influence of an intoxicant ("OWI").[1] See State v. Fischer, 2010 WI 6, ¶4, 322 Wis. 2d 265, 778 N.W.2d 629. In Fischer the court stated "the legislature's policy decision regarding the absolute inadmissibility of the PBT results under these circumstances simply could not be clearer." Id., ¶25. I wrote separately in Fischer, and concur in the case at issue, because I conclude that, as a matter of law, PBT results are neither reliable nor admissible for the purpose of proving a defendant's intoxication or specific alcohol concentration when either is an element of the crime charged.

¶42 While it is indeed true that precedent instructs us that under some circumstances PBT results may be deemed admissible, those cases do not approve of the admission of PBT results as proof of intoxication or a specific alcohol

---

[1] Wisconsin Stat. § 343.303 provides, in relevant part:

The result of the preliminary breath screening test shall not be admissible in any action or proceeding except to show probable cause for an arrest, if the arrest is challenged, or to prove that a chemical test was properly required or requested of a person under s. 343.305(3).

1

concentration when those factors are an element of the crime.[2] See State v. Doerr, 229 Wis. 2d 616, 622-25, 599 N.W.2d 897 (Ct. App. 1999) (agreeing with the circuit court that PBT results were admissible at trial to assist the jury in evaluating the defendant's charges of battery to a law enforcement officer in violation of Wis. Stat. § 940.20(2) and resisting an officer in violation of Wis. Stat. § 946.41); State v. Beaver, 181 Wis. 2d 959, 969-71, 512 N.W.2d 254 (Ct. App. 1994) (concluding that PBT results may be admissible at trial as evidence of the defendant's comprehension of his Miranda rights or his ability to intelligently waive them).[3]

¶43 Thus, I conclude that the legislature has spoken and PBT results are not admissible for the purpose of confirming or dispelling intoxication or a specific alcohol concentration when

---

[2] For example, in order to find Rocha-Mayo guilty of homicide by intoxicated use of a motor vehicle, contrary to Wis. Stat. § 940.09(1)(a) or (b), the State had to prove beyond a reasonable doubt that he (1) operated a motor vehicle, (2) caused the death of another by operation of that motor vehicle, and (3) was either under the influence of an intoxicant or had a prohibited alcohol concentration at the time he or she operated the motor vehicle. Wis JI——Criminal 1189. "[A]n alcohol concentration of more than 0.04 but less than 0.08 is relevant evidence on the issue of intoxication," Wis. Stat. § 885.235(1g)(b), and "an alcohol concentration of 0.08 or more is prima facie evidence" that the defendant was under the influence of an intoxicant, § 885.235(1g)(c).

[3] I recognize that PBT results are considered admissible at a probable cause hearing. Wis. Stat. § 343.303; State v. Faust, 2004 WI 99, ¶26, 274 Wis. 2d 183, 682 N.W.2d 371. PBT results are also utilized as a "screening tool" prior to arrest. See Cnty. of Jefferson v. Renz, 231 Wis. 2d 293, 313, 603 N.W.2d 541 (1999). Unlike the PBT, however, the Intoxilyzer provides for chemical testing that is subject to certain safeguards so to ensure reliability.

2

these considerations are an element of the crime. Accordingly, I would conclude and decide that the PBT results were inadmissible as a matter of law.

¶44 For the foregoing reasons, I respectfully concur.

¶45 I am authorized to state that Justices PATIENCE DRAKE ROGGENSACK and MICHAEL J. GABLEMAN join this concurrence.

¶46 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting).* I agree with Justice Prosser's dissent that it was error for the circuit court to admit the results of the defendant's preliminary breath test (PBT)[1] as evidence and that it was error for the circuit court to use the modified jury instruction.[2] I join Justice Prosser's dissent.

¶47 The majority opinion assumes that the admission of the PBT and the modified jury instruction were erroneous.[3]

¶48 Justice Ziegler's concurrence agrees with the majority opinion that the admission of the PBT results can be assumed to be error. But the concurrence goes further, concluding that the introduction of the PBT was indeed erroneous; "the PBT results were inadmissible as a matter of law." Concurrence, ¶43.[4] This concurrence is consistent with Justice Ziegler's concurrence in State v. Fischer, 2010 WI 6, ¶37, 322 Wis. 2d 265, 778 N.W.2d 629, which states that "as a matter of law PBT results are neither reliable nor admissible for the purpose of confirming or dispelling a defendant's specific alcohol concentration."

¶49 Thus six justices——Justice Ann Walsh Bradley, Justice David Prosser, Justice Patience Roggensack, Justice Annette Kingsland Ziegler, Justice Michael Gableman, and I——agree that

---

[1] Justice Prosser's dissent, ¶¶96-111.

[2] Justice Prosser's dissent, ¶¶112-118.

[3] Majority op., ¶4.

[4] See also Justice Prosser's dissent, ¶97 (quoting Justice Ziegler's concurrence).

1

the circuit court erred in admitting the PBT results in the present case.

¶50 The majority opinion (joined by Justice Ziegler) declares the assumed errors to be harmless.[5] In contrast, Justice Prosser's dissent concludes that the errors in the instant case were not harmless.[6] Once again I agree with the dissent. The PBT results and erroneous jury instruction were central to the prosecution's case; the errors were prejudicial.

¶51 I write separately, however, to highlight an additional error, namely the admission of the expert testimony of Dr. William Falco. The doctor was allowed to give an expert opinion that the defendant was "intoxicated" when he was in the emergency room. Such testimony is barred by our jurisprudence regarding the limits of expert opinion testimony

¶52 The State did not have to prove beyond a reasonable doubt that the defendant was "intoxicated." Rather, the State had to prove beyond a reasonable doubt that the defendant was "under the influence of an intoxicant" while operating the vehicle.[7]

¶53 "Under the influence of an intoxicant" is a legal term of art defined in Wis. Stat. § 939.22(42) to mean "the actor's ability to operate a vehicle . . . is materially impaired

---

[5] Majority op., ¶5.

[6] Justice Prosser's dissent, ¶¶119-134.

[7] See Wis. Stat. § 940.09(1)(a) (defining the crime of "caus[ing] the death of another by the operation or handling of a vehicle while under the influence of an intoxicant").

2

because of his or her consumption of an alcoholic beverage . . . ."

¶54 The legal definition of "under the influence of an intoxicant" is not necessarily the same as a doctor's use of the word "intoxicated" for purposes of determining proper medical diagnosis or treatment in a hospital, or the same as the common usage of the word "intoxicated."

¶55 I now turn to the Wisconsin rules of evidence governing expert opinion testimony.

¶56 Wisconsin Stat. § 907.04 provides as follows:

> Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.[8]

---

[8] The 1974 Judicial Council Committee's Note to § 907.04, Wisconsin Rules of Evidence, 59 Wis. 2d R211, states that the rule is consistent with Rabata v. Dohner, 45 Wis. 2d 111, 172 N.W.2d 409 (1969). The court declared in Rabata, 45 Wis. 2d at 125 (citing Charles T. McCormick, Some Observations Upon the Opinion Rule and Expert Testimony, 23 Tex. L. Rev. 109, 118, 119 (1944)), that opinion testimony on ultimate issues could be barred if phrased as a legal term of art:

> [A] court, even though not banning opinions on an ultimate issue, might nevertheless properly condemn a question phrased in terms of a legal criterion which could be misunderstood by the laymen on the jury. Such questions as, "Did X have sufficient mental capacity to make a will," or "Was X negligent," would properly be condemned on this basis——that they would confuse the jury rather than assist it——and be excluded from evidence.

Wis. Stat. § 907.04 adopted Federal Rule of Evidence 704 verbatim.

Federal Rule 704 was amended in 1984 to add subsection (b) as follows:

Rule 704. Opinion on an Ultimate Issue

3

¶57 As the majority opinion acknowledges, an expert witness cannot give opinion testimony on an ultimate issue "that is a legal concept for which the jury needs definitional instructions,"[9] although the expert may give opinion testimony as to an "ultimate issue to be decided by the trier of fact." The phrase "under the influence of an intoxicant" is a legal concept and a jury is instructed regarding the legal definition of "under the influence of an intoxicant."

¶58 The majority opinion acknowledges that the ultimate issue of whether the defendant was "under the influence of an intoxicant" under Wis. Stat. § 940.09(1)(a) was one requiring a specific, definitional jury instruction. Wisconsin JI——Criminal

---

(a) In General——Not Automatically Objectionable. An opinion is not objectionable just because it embraces an ultimate issue.

(b) Exception. In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

For a discussion of the Federal Rule, see Charles Alan Wright et al., 29 Federal Practice & Procedure: Evidence § 6282 (2d ed. 1997 & Supp.); 1 McCormick On Evidence § 12 (Kenneth S. Broun ed., 7th ed. 2013).

For other rules of evidence governing admissibility of expert opinion testimony, see Wis. Stat. ch. 907.

[9] Majority op., ¶¶26-27 (citing Wis. Stat. § 907.04 & Lievrouw v. Roth, 157 Wis. 2d 332, 351-52, 459 N.W.2d 850 (Ct. App. 1990)).

1185, which was given to the jury in the instant case,[10] defines "under the influence of an intoxicant" for the jury as follows:

> "Under the influence of an intoxicant" means that the defendant's ability to operate a vehicle was materially impaired because of consumption of an alcoholic beverage.
>
> Not every person who has consumed alcoholic beverages is "under the influence" as that term is used here. What must be established is that the person has consumed a sufficient amount of alcohol to cause the person to be less able to exercise the clear judgment and steady hand necessary to handle and control a motor vehicle.
>
> It is not required that impaired ability to operate be demonstrated by particular acts of unsafe driving. What is required is that the person's ability to safely control the vehicle be materially impaired (footnote omitted).

¶59 In the instant case, the doctor's testimony used the term "intoxication" in its medical sense, not the sense of the legal term of art "under the influence of an intoxicant" as defined in the statutes and the jury instruction. Dr. Falco testified that when the defendant entered the emergency room, in his expert opinion the defendant was intoxicated. The exchange between the prosecutor and the doctor, over the defense's objection, ensued as follows:

> [PROSECUTOR]: Doctor, over the 13 years where you had occasion to treat accident patients that have consumed alcohol, were you able to make a diagnosis of whether or not they were under the influence of alcohol?
>
> [DOCTOR]: Yes, several times.
>
> [PROSECUTOR]: Do you believe you're qualified to in this case render that opinion?

---

[10] See majority op., ¶2.

5

[DOCTOR]: I do. I mean, I see intoxicated patients not in accidents pretty much on a daily basis that I'm——

[PROSECUTOR]: And when you're looking at those patients, what are those things that you are looking at? What are the factors? What are the symptoms of alcohol intoxication?

[DOCTOR]: Well, their behavior; their——you know, the——obviously the smell of alcohol on their breath; their speech, the clarity of their speech; you know, if they had redness to their eyes; their ability to ambulate or, you know, walk with the steady gait, things like that.

[PROSECUTOR]: And based upon your treatment, based on your experience and medical practice as an emergency room physician, and your contact and examination and assessment of this patient, [the defendant], do you have an opinion as to his state of sobriety?

[DOCTOR]: I do.

[PROSECUTOR]: And what is your opinion?

[The defense objected and was overruled.]

[DOCTOR]: I believe he was intoxicated at the time.

[PROSECUTOR]: And do you hold that opinion to a reasonable degree of scientific and medical certainty?

[DOCTOR]: I do.

¶60 Expert opinion testimony? Check. Ultimate issue in the case? Check. Requiring a definitional jury instruction? Check.

¶61 Nonetheless, the majority opinion in the instant case permits the doctor's testimony about the defendant's intoxication <u>when he entered the emergency room</u>.

¶62 The majority opinion creatively but fallaciously reasons that the testimony is admissible because the doctor

6

"never offered any opinion as to [the defendant's] condition or level of intoxication <u>at the time of the accident</u>."[11]

¶63 The State defends the admission of the doctor's testimony on the grounds that the doctor never offered an opinion as to whether the defendant's ability to safely control the vehicle was materially impaired.

¶64 True, the doctor did not express an opinion about the defendant's intoxication at the time of the accident or about the defendant's ability to operate a vehicle. So, I ask, what is the <u>relevance</u> of the doctor's expert opinion about the defendant's intoxication in the emergency room? Is it relevant because it enables a jury to infer from the doctor's testimony that the defendant, who was intoxicated at the hospital, had a materially impaired ability to operate a vehicle at the time of the accident? It seems to me this must be the unstated rationale. Is this inference permissible? No! Why not? Because the doctor's medical definition of "intoxicated" for purposes of medical diagnosis and treatment at the emergency room is different than the legal definition of "under the influence of an intoxicant."

¶65 Admitting the doctor's expert testimony in the present case leads the jury to the mistaken belief that "intoxication" as used by a doctor as a medical term is the same as the legal term of art "under the influence of an intoxicant."

¶66 How can the jury make the inferential leap from the doctor's expert opinion about intoxication for medical diagnosis

---

[11] Majority op., ¶25 (emphasis added).

and treatment purposes to finding beyond a reasonable doubt that the defendant was "under the influence of an intoxicant" as a defined legal element of the crime?

¶67 The doctor's testimony therefore does not assist the trier of fact under the relevance-assistance standard of Wis. Stat. § 907.02(1).[12] Indeed, the doctor's testimony confuses, rather than assists, the jury.

¶68 To avoid jury confusion, the rules of evidence and the case law militate against the admission of expert testimony on legal concepts or terms of art. Analyzing our case law, Professor Blinka's treatise wisely advises that when weighing whether expert testimony phrased in terms of legal standards is admissible, "a prime consideration is whether the concept under consideration is a peculiarly legal construct or one that is also rooted in common usage."[13]

---

[12] Wisconsin Stat. § 907.02(1) provides:

(1) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

The rules of evidence thus exclude the doctor's opinion in the present case, not only as violating Wis. Stat. § 907.04 and our case law, but also as not helpful to the trier of fact and as a waste of time.

[13] 7 Daniel D. Blinka, Wisconsin Practice Series: Wisconsin Evidence § 702.603 (3d ed. 2008).

8

¶69 Professor Blinka cites Lievrouw v. Roth, 157 Wis. 2d 332, 351-52, 459 N.W.2d 850 (Ct. App. 1990), as does the majority opinion.[14] The Lievrouw court ruled that an expert witness's opinion may not be admissible on a "legal concept for which the jury needs definitional instructions." In Lievrouw, the court determined that a witness's opinion regarding the existence of an "emergency" was admissible because "emergency" was not defined for the jury and was not a "term of art."[15]

¶70 By admitting the doctor's expert opinion testimony on the defendant's intoxication, the circuit court permitted exactly the kind of confusing expert testimony on an ultimate legal concept that was held inadmissible under Lievrouw.

¶71 More can be and has been written on the meaning, application, continued vitality, and nuances of Wis. Stat. § 907.04 and the proper phrasing of questions for the expert to comply with the rule. For the purposes of this dissent in the present case, I do not write on the rule at length. I think it important to engage this issue, point out the problems with the majority opinion's discussion, and foster discussion of the rule.

¶72 For the foregoing reasons, I join Justice Prosser's dissent and write separately.

_____

[14] Majority op., ¶¶26-27 (citing Wis. Stat. § 907.04 and Lievrouw, 157 Wis. 2d at 351-52).

[15] Lievrouw, 157 Wis. 2d at 351-52.

9

¶73 DAVID T. PROSSER, J. *(dissenting).* The majority opinion has been constructed to present a black and white picture of a reckless defendant. Unfortunately, there is more to the story. The facts left out are not pretty, and their ugliness helps explain why a Kenosha County jury deliberated about 20 hours, over four days, before reaching a verdict.

¶74 When a jury deliberates for 20 hours on a seemingly simple case, something about the case has troubled them. When a jury has deliberated for 20 hours before convicting a defendant, facile assurances that critical errors in the trial were harmless to that defendant can be unpersuasive and unsettling. For the reasons stated below, I believe this defendant should be given a new trial. Consequently, I respectfully dissent.

FACTUAL BACKGROUND

¶75 The defendant in this case, Luis M. Rocha-Mayo, was 19 years old at the time of the accident. He was an undocumented immigrant from Mexico whose primary language is Spanish and who required an interpreter throughout the criminal proceedings. The jury knew that many months had passed between the charges and the trial.[1] None of this affected the jury's conscientious consideration of the case.

¶76 On June 21, 2008, the defendant was at his apartment with family. Between 7 p.m. and 9 p.m. he consumed three beers. About 9 p.m., the group traveled in separate cars to El Rodeo, a

---

[1] Rocha-Mayo was in custody, on $100,000 bond, from the time of his arrest until the time of trial, and he received 865 days of credit on the ten years of confinement in his bifurcated sentence.

bar at the corner of 14th Avenue and 52nd Street in Kenosha. Over the next five hours, the defendant consumed five beers and ordered a sixth, which he partially consumed at the bar and took with him to finish in his car when he left at 2 a.m.

¶77 Thus, between 7 p.m. on June 21 and 2 a.m. on June 22——seven hours——the defendant consumed at least nine beers. He claimed also that between the initial three beers and the last six beers he drank some soda. The defendant's drinking is not in dispute; the effect of his drinking is.

¶78 When the defendant left El Rodeo, he pulled his vehicle onto 52nd Street and proceeded west, intending to return to his apartment on 40th Avenue. Within a few blocks, three motorcycles entered 52nd Street from the parking lot for Coins Tavern, which has an address of 1714 52nd Street.

¶79 The defendant's version of the story is that a motorcycle carrying two people, Curtis Martin (Martin) and Shawna Bestwick (Shawna), merged into the right lane directly in front of the defendant's vehicle. Two other motorcycles then entered the street immediately behind the defendant's vehicle. One of these cycles was driven by Travis Bestwick (Bestwick); the other was driven by Jason Walters (Walters). Bestwick was Shawna's brother. He was riding Martin's motorcycle, and Martin was riding Bestwick's motorcycle, because Bestwick's cycle was better suited for carrying a passenger.

¶80 The motorcyclists had been riding as a group, and apparently Bestwick and Walters became offended when members of the group were separated by Rocha-Mayo's car. Walters pulled up

2

parallel to the defendant's car, alongside the driver's window. He yelled at Rocha-Mayo with an obscenity and gestured for him to pull over. Martin and Shawna heard the yelling behind them and then turned off on 25th Avenue in a maneuver that enabled them to end up behind the defendant's car with the other motorcycles. The defendant's brief reads in part as follows:

> At this point, Rocha Mayo testified, he sensed Walters and his group were looking for trouble and the situation felt threatening. Realizing he now had three cycles around him, and believing them all in a mood to harm him, Rocha Mayo did not pull over as Walters demanded. Instead, he resolved to continue home, which required he remain on 52nd Street and turn right at 40th Avenue. He therefore continued westbound at the approximate speed limit, just hoping to get home.

¶81 Walters pulled back behind Rocha-Mayo's car. He reached into his jacket for an expandable metal baton and flicked it open with the wrist of his right hand. He then accelerated his bike to the left of the defendant's car and launched the metal baton at the car's rear window while traveling at high speed. The baton shattered the rear window of the car and landed on the floor in front of the passenger's seat. Glass fragments flew throughout the car. Bestwick followed Walters past the defendant's car. The defendant's brief explains:

> From Rocha Mayo's perspective, his premonition of danger suddenly became a rude reality when his rear window exploded as two cycles roared by him on the left. The explosion caused Rocha Mayo to momentarily duck and he was convinced he was going to get hit. When he regained his wits, he instinctively accelerated because another cycle was behind him, in addition to the two cycles now in front of him, and he was scared. He feared another assault from the rear.

3

Although still in the right lane and somewhere near 30th and 33rd Avenues, he resolved not to turn off on 40th Avenue so the cyclists would not learn where he lived.

¶82 After Walters' baton shattered Rocha-Mayo's window, Rocha-Mayo and the two motorcycles in front of him speeded westward on 52nd Street at approximately 70 miles per hour. The third motorcycle followed for several blocks, then turned off on 39th Avenue. Rocha-Mayo testified, however, that he continued to believe he was being pursued by the third cycle, so that he thought he had two cycles ahead of him and one cycle behind him. As noted, he did not slow down to turn off on 40th Avenue, allegedly because he was afraid he would be followed to his apartment.

¶83 The ostensible "race" with the three vehicles on 52nd Street continued for more than 20 blocks until the vehicles came to the intersection with Green Bay Road. The defendant's brief reads as follows:

> As the vehicles approached that intersection, the stop light for westbound traffic was red . . . . The two westbound lanes, that were also free of traffic, widened first to three lanes (a dedicated left turn lane) and then to four lanes (a shorter dedicated right turn lane). . . . Rocha Mayo believed he still had a third cycle behind him. . . .
>
> As the vehicles neared the intersection, Bestwick and Walters, via hand signals (but unbeknownst to Rocha Mayo), decided to attempt a right turn onto North Green Bay Road, a maneuver the State's accident investigator agreed would have been impossible at their speed. Rocha Mayo was still in the right hand lane and from his perspective, Walters and Bestwick were off to the left in front of him. Suddenly Walters braked, but realized a turn would be impossible, and wound up sliding into and stopping in the middle of the intersection. Bestwick, however,

4

attempted the turn and moved to the right, directly in front of Rocha Mayo's vehicle, while braking. Rocha Mayo could not react fast enough to avoid striking Bestwick.

¶84 Rocha-Mayo's vehicle collided with Bestwick's motorcycle. Bestwick, who had not been wearing a helmet, was thrown from the cycle and eventually died of blunt force trauma to the head. Rocha-Mayo was injured in the crash, was found by police lying in pain in nearby grass, and like Bestwick, was transported to a hospital.

¶85 Walters, according to testimony at the trial, came to a complete stop in the intersection, looked around from the vantage point where he could see both vehicles at a complete rest, with Bestwick lying in the street. Walters then took off southbound on Green Bay Road as a police car approached.

¶86 Walters called Shawna about the accident, and she and Martin quickly drove to the accident scene. However, they left without telling police of their knowledge or involvement and waited more than 19 hours before contacting authorities. When they came to talk, the motorcyclists blamed the tragic events entirely on Rocha-Mayo. Whether the motorcyclists had been operating under the influence was never established, in large part because they absented themselves from authorities. None of the motorcyclists, including the baton-launching Walters, was ever charged with any offense.[2]

---

[2] Motorcycles have been a rich and important part of Wisconsin history. Nothing in this dissent is intended to imply any criticism whatsoever of the overwhelming number of responsible motorcycle owners and operators in this state.

5

¶87 Bestwick died on Sunday, June 22, 2008. The following day, Rocha-Mayo was charged with second-degree reckless homicide with a dangerous weapon, contrary to Wis. Stat. §§ 940.06(1), 939.50(3)(d), and 939.63(1)(b), a Class D felony.

¶88 Following a preliminary examination on July 2, 2008, the State filed an information charging Rocha-Mayo with three offenses:

(1) First-degree reckless homicide, with use of a dangerous weapon, contrary to Wis. Stat. §§ 940.02(1), 939.50(3)(b), and 939.63(1)(b), a Class B felony instead of the Class D felony originally charged.

(2) First-degree reckless endangerment, with use of a dangerous weapon, contrary to Wis. Stat. § 941.30(1), 939.50(3)(f), and 939.63(1)(b), a Class F felony. The information asserted that Rocha-Mayo "did recklessly endanger the safety of Jason A. Walters, under circumstances which show utter disregard for human life."

(3) Operating without a valid license causing death to another person, contrary to Wis. Stat. §§ 343.05(5)(b)3d and 939.51(3)(a), a Class A misdemeanor.

¶89 Seven months later, on February 11, 2009, the State moved the circuit court to amend the information to add a fourth charge of homicide by intoxicated use of a motor vehicle, contrary to Wis. Stat. §§ 940.09(1)(a) and 939.50(3)(d), a Class D felony. The motion was granted by Circuit Judge Bruce Schroeder. In his motion, District Attorney Robert Zapf wrote:

At the court hearing on the defendant's motion to adjourn the trial date, the Court inquired whether the

6

State was intending to pursue any alcohol related charges. At that time, this writer advised the Court that I did not think the BAC test performed by the hospital would be admissible. However, your affiant has reviewed all of the evidence and reconsidered its original position.

¶90 Rocha-Mayo thereafter successfully moved Judge Schroeder to recuse himself from the case. Judge Wilbur W. Warren III was assigned to the case.

¶91 The facts stated above closely follow the defendant's brief and obviously convey the defendant's perspective on some of the facts. Significantly, however, the State did not rewrite the statement of facts. Rather, the State said:

> Rocha-Mayo's statement of facts consists largely of facts about the criminal incident itself, from the viewpoint most favorable to him. Because the criminal incident facts are not directly pertinent to the legal issues, the State will not present a counter statement of criminal incident facts. By declining to do so, the State does not in any way intend to agree with Rocha-Mayo's partisan presentation of the facts. The evidence presented, viewed in the light most favorable to the State as it must be after conviction, was sufficient to prove Rocha-Mayo guilty beyond a reasonable doubt.

¶92 The facts above, presented in large part from the defendant's perspective, are damaging to the defendant. But they also suggest the possibility that Bestwick's tragic death would not have happened but for actions initiated by Walters and the other motorcyclists. This was Rocha-Mayo's explanation from the day of his arrest and his defense throughout the trial. It underlies his position now. Consequently, the issues presented in this review are integrally related to the specific felonies with which Rocha-Mayo was charged and convicted, and the specific facts leading up to Bestwick's death. If the issues

7

presented by the defendant reveal errors in the trial, it is very, very difficult to assert that these errors did not "contribute" to the verdict.

ADMISSIBILITY OF THE PBT RESULT

¶93 Rocha-Mayo states his first issue as follows: "whether Wisconsin's breath testing regimen allows the State to present evidence of a PBT result in an OWI prosecution to quantitatively prove the defendant was under the influence of an intoxicant, simply because the PBT was not administered by law enforcement."

¶94 Following the accident, Rocha-Mayo was taken to the emergency room at St. Catherine's Medical Center. The State's brief states that Rocha-Mayo was strapped to a backboard and had swollen lips and blood on his face; he was confused and emitted an obvious odor of alcohol. The State's brief goes on to describe how Dr. William Falco, the emergency room doctor, almost immediately ordered the emergency room nurse, Steven Edwards, to do a breath alcohol test to try to determine whether Rocha Mayo's confusion was caused by a head injury or alcohol. The defendant's brief states, "Nurse Edwards complied, Rocha Mayo consented and cooperated, and a PBT test result of 0.086 was taken. It was a single sample test."

¶95 Prior to trial, Rocha-Mayo moved to suppress the result of the PBT obtained at the hospital emergency room. Rocha-Mayo argued that the result of the test was inadmissible under Wis. Stat. § 343.303. After a hearing, the circuit court disagreed and admitted the test result at trial.

8

¶96 This issue——the admissibility of the PBT result in a trial involving traffic-related offenses, including homicide by intoxicated use of a motor vehicle——is surely the reason the court took this case. Significantly, no one on the court is prepared to say that the circuit court correctly admitted the evidence.

¶97 In State v. Fischer, 2010 WI 6, ¶4, 322 Wis. 2d 265, 778 N.W.2d 629, the court unanimously held that "Wisconsin Stat. § 343.303 expressly bars PBT results in OWI cases." After joining the opinion, Justice Ziegler concurred, stating, "I conclude that as a matter of law PBT results are neither reliable nor admissible for the purpose of confirming or dispelling a defendant's specific alcohol concentration in an OWI or PAC trial." Id., ¶37 (Ziegler, J., concurring, joined by Justices Roggensack and Gableman).

¶98 In her concurrence in the present case, Justice Ziegler adds that "the legislature has spoken and PBT results are not admissible for the purpose of confirming or dispelling intoxication or a specific alcohol concentration when these considerations are an element of the crime." Concurrence, ¶43.

¶99 Against this background, the majority nonetheless is willing to decide the case by assuming, without deciding, "that the circuit court erred when it allowed the State to admit, as evidence, the PBT result obtained by a medical professional for diagnostic purposes," majority op., ¶4, and then affirming Rocha-Mayo's convictions on the basis of harmless error.

9

¶100 In this case, assuming error rather than deciding error has the unfortunate effect of ducking a vital issue that should be decided and burying the reasons for an "inadmissibility" ruling.

¶101 Wisconsin Stat. § 343.303 reads as follows:

> Preliminary breath screening test. If a law enforcement officer has probable cause to believe that the person is violating or has violated s. 346.63(1) or (2m) or a local ordinance in conformity therewith, or s. 346.63(2) or (6) or 940.25 or s. 940.09 where the offense involved the use of a vehicle, or if the officer detects any presence of alcohol, a controlled substance, controlled substance analog or other drug, or a combination thereof, on a person driving or operating or on duty time with respect to a commercial motor vehicle or has reason to believe that the person is violating or has violated s. 346.63(7) or a local ordinance in conformity therewith, the officer, prior to an arrest, may request the person to provide a sample of his or her breath for a preliminary breath screening test using a device approved by the department for this purpose. The result of this preliminary breath screening test may be used by the law enforcement officer for the purpose of deciding whether or not the person shall be arrested for a violation of s. 346.63(1), (2m), (5) or (7) or a local ordinance in conformity therewith, or s. 346.63(2) or (6), 940.09(1) or 940.25 and whether or not to require or request chemical tests as authorized under s. 343.305(3). The result of the preliminary breath screening test shall not be admissible in any action or proceeding except to show probable cause for an arrest, if the arrest is challenged, or to prove that a chemical test was properly required or requested of a person under s. 343.305(3). Following the screening test, additional tests may be required or requested of the driver under s. 343.305(3). The general penalty provision under s. 939.61(1) does not apply to a refusal to take a preliminary breath screening test.

¶102 The most important sentence in this section is: "The result of the preliminary breath screening test <u>shall not be admissible in any action or proceeding</u> except to show probable

10

cause for an arrest, if the arrest is challenged, or to prove that a chemical test was properly required or requested of a person under s. 343.305(3)." Id. (emphasis added).

¶103 The title of § 343.303 is "Preliminary breath screening test." The phrase "preliminary breath screening test" appears four times in the text of the section. The key word among the four words is "preliminary," and that word is wholly consistent with the expectation that "additional tests may be required or requested of the driver under s. 343.305(3)." Id.

¶104 Wisconsin Stat. § 343.305 is entitled "Tests for intoxication; administrative suspension and court-ordered revocation." This section outlines the tests for intoxication that are admissible in evidence in traffic-related prosecutions. Wisconsin Stat. § 343.305(5)(d) provides in part:

> [T]he results of a test administered in accordance with this section are admissible on the issue of whether the person was under the influence of an intoxicant . . . to a degree which renders him . . . incapable of safely driving . . . or any issue relating to the person's alcohol concentration. Test results shall be given the effect required under s. 885.235.[3]

---

[3] Wisconsin Stat. § 885.235(1g) reads in part:

> In any action or proceeding in which it is material to prove that a person was under the influence of an intoxicant . . . evidence of the amount of alcohol in the person's breath, is admissible on the issue of whether he . . . was under the influence of an intoxicant or had a prohibited alcohol concentration or a specified alcohol concentration if the sample was taken within 3 hours after the event to be proved. The chemical analysis shall be given effect as follows without requiring any expert testimony as to its effect:

11

These tests include taking a sample of the person's breath, consistent with the "techniques or methods of performing chemical analysis of the breath" set out in Wis. Stat. § 343.305(6)(b) and (c).

¶105 The Department of Transportation's (DOT) administrative rules, as required by statute, Wis. Stat. § 343.305(6)(b), spell out in detail the approved techniques and methods for performing chemical analysis of the breath. See Wis. Admin. Code § TRANS 311.06 (Mar. 2012). Much of Rocha-Mayo's argument seeks to show that the test taken at the hospital emergency room, the result of which was admitted at trial, did not satisfy the requirements set out in statute and rules, thereby rendering the result not only inadmissible but also unreliable.

¶106 The distinction between breath tests admissible under Wis. Stat. § 343.305(5)(d) and Wis. Stat. § 885.235 and PBTs inadmissible under Wis. Stat. § 343.303 is highlighted in Wis. Admin Code § TRANS 311 in the definition section, which distinguishes "Quantitative breath alcohol analysis" from "Qualitative breath alcohol analysis."

¶107 "'Qualitative breath alcohol analysis' means a test of a person's breath, the results of which indicate the presence or

. . . .

(c) The fact that the analysis shows that the person had an alcohol concentration of 0.08 or more is prima facie evidence that he . . . was under the influence of an intoxicant and is prima facie evidence that he . . . had an alcohol concentration of 0.08 or more.

12

absence of alcohol." Wis. Admin. Code § TRANS 311.03(12) (Mar. 2012). "'Quantitative breath alcohol analysis' means a chemical test of a person's breath which yields a specific result in grams of alcohol per 210 liters of breath." Wis. Admin. Code § Trans 311.03(13) (Mar. 2012). Wisconsin Admin. Code § TRANS 311.06(2) explains that "[t]echniques used in performing quantitative breath alcohol analysis shall be those which are designed to assure accuracy, detect malfunctions and to safeguard personnel and equipment." (Emphasis added.) Wisconsin Admin. Code § TRANS 311.06(5) provides only that "[m]ethods and techniques used in performing qualitative breath alcohol analysis shall be approved by the department." (Emphasis added.)

¶108 In testimony at trial, Susan Hackworthy, chief of the chemical test section, Division of State Patrol, in the DOT, explained that "The qualitatives are PBT and the quantitatives are evidential." She also testified that the Alco-Sensor IV, the PBT device used at St. Catherine's Medical Center, is not certified by the DOT for evidentiary use in Wisconsin courts and that the DOT does not certify breath testing devices in the private sector.

¶109 Rocha-Mayo's trial counsel cross-examined Hackworthy on various procedures in the administrative rules designed to assure accuracy in test results and to avoid error——procedures that are required to be followed in "evidential" tests but are not part of the ordinary regimen for PBTs. The State's expert grudgingly acknowledged: "A preliminary breath test is generally

13

not allowed in an OWI trial in front of a jury." She further acknowledged in response to hypothetical questions that in the absence of certain protocols, a breath test would not satisfy State Patrol guidelines for evidence. In this case, several of the protocols were not met in the hospital PBT, including an assurance that Rocha-Mayo did not have an unusual amount of mouth alcohol because of his recent drinking or the accident, which affected both his head and his chest.

¶110 To sum up, Wis. Stat. § 343.303 provides that a preliminary breath screening test is not admissible in any action or proceeding except as authorized by that statute. When court decisions have deviated from this statutory directive, they have deviated only in cases that did not involve traffic enforcement and did not require a quantitative analysis that shows "a specific result in grams of alcohol per 210 liters of breath." Wis. Admin. Code § TRANS 311.03(13) (Mar. 2012). In this case, the admission of the PBT result does not fit within any plausible exception to the statutory directive and comes with few of the protocols that assure the integrity and reliability of the tests authorized by Wis. Stat. § 343.305(3).

¶111 Wisconsin Stat. § 343.303 creates a regimen that encourages a driver's cooperation with law enforcement inasmuch as the test result is inadmissible, except as provided by statute, and a refusal to take the PBT strengthens the probable cause for an arrest. Permitting the results of PBTs taken in hospital settings to be used later against hospital patients in court will engender distrust between doctors and patients and

14

create disincentives for patients to comply with the requests of their doctors. Once courts open the door to use of PBT results without safeguards and without legislative authorization, evasions of the directive in § 343.303 will become commonplace, and the essential purpose of the statute will be thwarted.

CORRECTNESS OF MODIFIED JURY INSTRUCTION 1185

¶112 Rocha-Mayo's second issue is "whether it was error to instruct the jury it could find, based solely on a <u>qualitative</u> test result, that Rocha-Mayo was intoxicated at the time of the accident."

¶113 The majority's response to this question is, "[W]e assume, without deciding, that the circuit court erred under these circumstances in utilizing Wis JI——Criminal 1185 to instruct the jury on its use of the PBT evidence," majority op., ¶4, but the error was harmless beyond a reasonable doubt. <u>Id.</u>, ¶5.

¶114 The circuit court gave the following instruction in relation to the third element of the offense charged under Wis. Stat. § 940.09(1)(a), namely, that the defendant was under the influence of an intoxicant at the time the defendant operated a vehicle.

> The third element is the defendant was under the influence of an intoxicant at the time the defendant operated a vehicle.
>
> "Under the influence of an intoxicant" means that the defendant's ability to operate a vehicle was materially impaired because of consumption of an alcoholic beverage.
>
> Not every person who has consumed alcoholic beverages is "under the influence" as that term is

15

used here. What must be established is that the person has consumed a sufficient amount of alcohol to cause the person to be less able to exercise the clear judgment and steady hand necessary to handle and control a motor vehicle.

It is not required that impaired ability to operate be demonstrated by particular acts of unsafe driving. What is required is that the person's ability to safely control the vehicle be materially impaired.

The law states that the alcohol concentration in a defendant's breath sample taken within three hours of operating a vehicle is evidence of the defendant's alcohol concentration at the time of the operating.

If you are satisfied beyond a reasonable doubt that there was .08 grams or more of alcohol in 210 liters of the defendant's breath at the time the test was taken, you may find that the defendant was under the influence of an intoxicant at the time of the alleged operating, but you are not required to do so. You, the jury, are here to decide this question on the basis of all the evidence in this case, and you should not find the defendant was under the influence of an intoxicant at the time of the alleged operating, unless you are satisfied of that fact beyond a reasonable doubt.

¶115 The circuit court omitted four words from the standard instruction when it gave the instruction above: namely, "from that fact alone." Normally, the last paragraph of the instruction reads:

If you are satisfied beyond a reasonable doubt that there was .08 grams or more of alcohol in 210 liters of the defendant's breath at the time the test was taken, you may find <u>from that fact alone</u> that the defendant was under the influence of an intoxicant at the time of the alleged operating, but you are not required to do so. You the jury are here to decide this question on the basis of all the evidence in this case, and you should not find that the defendant was under the influence of an intoxicant at the time of the alleged operating, unless you are satisfied of that fact beyond a reasonable doubt.

16

Wis JI——Criminal 1185.

¶116 The wording of the standard instruction makes clear that it is derived from Wis. Stat. § 885.235(1g)(c) and is intended to be used for a test authorized by Wis. Stat. § 343.305(3), not a PBT authorized under Wis. Stat. § 343.303. Removal of the four words really changes nothing, because the standard instruction never <u>requires</u> the jury to find that the defendant was under the influence of an intoxicant. The instruction as written and the instruction as modified both authorize or permit the jury to find a defendant guilty if it is satisfied beyond a reasonable doubt that the defendant had .08 grams or more of alcohol in 210 liters of his breath at the time the test was taken. After all, to quote the instruction, "The law states that the alcohol concentration in a defendant's breath sample taken within three hours of operating a vehicle is evidence of the defendant's alcohol concentration at the time of the operating," and the test result was .086.

¶117 Immediately following instruction 1185 cited above, the court gave an instruction in relation to the defendant's defense:

> Wisconsin law provides that it is a defense to this crime if the death would have occurred even if the defendant had been exercising due care and had not been under the influence of an intoxicant.

> The burden is on the defendant to prove by evidence which satisfies you to a reasonable certainty by the greater weight of the credible evidence that this defense is established.

> "By the greater weight of the credible evidence" is meant evidence which, when weighed against that opposed to it, has more convincing power. "Credible

17

evidence" is evidence which in the light of reason and common sense is worthy of belief.

Evidence has been received relating to the conduct of Travis Bestwick at the time of the alleged crime. Any failure by Travis Bestwick to exercise due care does not by itself provide a defense to the crime charged against the defendant. Consider evidence of the conduct of Travis Bestwick in deciding whether the defendant has established that the death would have occurred even if the defendant had not been under the influence of an intoxicant and had been exercising due care.

If you are satisfied to a reasonable certainty by the greater weight of the credible evidence that this defense is proved, you must find the defendant not guilty.

If you are not satisfied to a reasonable certainty by the greater weight of the credible evidence that this defense is proved and you are satisfied beyond a reasonable doubt that all elements of this offense have been proved, you should find the defendant guilty.

If you are not satisfied beyond a reasonable doubt that all elements of this offense have been proved, you must find the defendant not guilty.

¶118 More than anything else in the court's instructions to the jury, these paragraphs relate to Rocha-Mayo's explanation and defense of his conduct. But the quoted paragraphs immediately followed a potent instruction that should not have been given.

HARMLESS ERROR

¶119 The majority assumes, even if it does not concede, two critical errors in Rocha-Mayo's trial. It dismisses these errors as harmless beyond a reasonable doubt by pointing to evidence sufficient to sustain the defendant's conviction.

¶120 In State v. Martin, 2012 WI 96, ¶45, 343 Wis. 2d 278, 816 N.W.2d 270, this court repeated the classic test for harmless error: whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." Id. (quoting State v. Harvey, 2002 WI 93, ¶49, 254 Wis. 2d 442, 647 N.W.2d 189). But the court added valuable commentary:

> Framed a different way, an "error is harmless if the beneficiary of the error proves 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" State v. Mayo, 2007 WI 78, ¶47, 301 Wis. 2d 642, 734 N.W.2d 115 (quoting State v. Anderson, 2006 WI 77, ¶114, 291 Wis. 2d 673, 717 N.W.2d 74). Therefore, this court must be satisfied, beyond a reasonable doubt, not that the jury could have convicted the defendant (i.e., sufficient evidence existed to convict the defendant), State v. Weed, 2003 WI 85, ¶28, 263 Wis. 2d 434, 666 N.W.2d 485, but rather that the jury would have arrived at the same verdict had the error not occurred. See Harvey, 254 Wis. 2d 442, ¶46 (quoting [Neder v. United States, 527 U.S. 1, 18 (1999)]).

Id. (citation omitted).

¶121 The court went on to cite several factors that assist a court's analysis of whether an error is harmless. Id., ¶46. These factors include "the importance of the erroneously admitted evidence" and "the nature of the defense." Id.

¶122 It would be hard for this writer to contend that the defendant would not have been convicted and should not have been convicted of something for his role in Bestwick's death. The issue, however, is whether the jury would have arrived at the same verdict on all the offenses charged had the errors not occurred.

19

¶123 It must be remembered that the Kenosha County District Attorney did not charge Rocha-Mayo with a violation of Wis. Stat. § 940.09(1)(a) (homicide by intoxicated use of a vehicle) until many months after the accident because he did not have an authorized breath or blood test, and he thought the PBT result was inadmissible. If he had not been encouraged to file this charge with the implication that the PBT result would be admitted, he might never have filed the charge at all.

¶124 If the test result had not been admitted, the jury would not have had any numerical evidence of the amount of alcohol in the defendant's breath. If the test result had not been admitted, the court likely would not have read the disputed portion of Wis JI——Criminal 1185, even if a homicide by intoxicated use of a vehicle charge had been filed.

¶125 Erroneously admitting the PBT result as legitimate evidence gave scientific support to Dr. William Falco's opinion testimony that the defendant was intoxicated. This testimony, whether it was correct or incorrect, would have been much less powerful absent the PBT result.

¶126 In short, to assert not only that the jury could have convicted the defendant of Wis. Stat. § 940.09(1)(a) but also that the jury would have convicted the defendant of that offense——beyond a reasonable doubt——without the inadmissible PBT result and the mistaken instruction——is not persuasive because it greatly undervalues the effect of having a chemical test of the defendant's breath, blood, or urine as evidence in a criminal prosecution.

20

¶127 But the effect of the two errors may have been even greater.

¶128 Rocha-Mayo had a recognized legal defense to the charge of homicide by operation of a motor vehicle while under the influence——a defense alluded to in Judge Warren's jury instructions. He did not have an equivalent legal <u>defense</u> to the charges under Wis. Stat. §§ 940.02 and 941.30. Nonetheless, Rocha-Mayo did have an avenue for attacking the element of "circumstances that show utter disregard for human life" in both offenses. The jury instructions for Wis. Stat. §§ 940.02 and 941.30 both contain the following language:

> In determining whether the circumstances of the conduct showed utter disregard for human life, consider these factors: what the defendant was doing; <u>why the defendant was engaged in that conduct</u>; how dangerous the conduct was; how obvious the danger was; whether the conduct showed any regard for life; and, <u>all other facts and circumstances relating to the conduct</u>.

Wis JI——Criminal 1020, 1345 (emphasis added) (footnote omitted).

¶129 The comment to Wis JI——Criminal 1020 for first-degree reckless homicide observes, "All the circumstances relating to the defendant's conduct should be considered in determining whether that conduct shows 'utter disregard' for human life. These circumstances would include facts relating to the possible provocation of the defendant." The comment continues: "Evidence of provocation will usually be admissible in prosecutions for crimes requiring criminal recklessness . . . (and, in prosecutions under this section, whether the circumstances show utter disregard for human life)." Comment, Wis JI——Criminal

21

1020 (quoting Judicial Council Note to § 940.02, 1987 S.B. 191). Similar language is found in the Comment to Wis JI——Criminal 1345 related to first-degree recklessly endangering safety.

¶130 Wisconsin Jury Instruction 1185 <u>invited</u> the jury to find the defendant guilty of operating his vehicle under the influence and causing the death of Bestwick because of the .086 PBT result. Any juror who accepted that invitation was likely to disregard Rocha-Mayo's legal defense and likely to dismiss the effect of provocation in evaluating an attack on the element of "utter disregard for human life."

¶131 The admission of inadmissible evidence and the faulty instruction that was given because of the admission of that inadmissible evidence were critically tied to all three felony convictions.

¶132 The jury deliberated in Rocha-Mayo's case for about 20 hours, over four days, before rendering its verdict. It twice advised the court that the jurors were deadlocked. When the verdicts finally came, many of the jurors cried as the verdicts were read.

¶133 When an admired circuit court judge instructed the jury "upon the principles of law which you are to follow in considering the evidence," he made this statement: "It is your duty to follow all of these instructions. Regardless of any opinion you may have about what the law is or ought to be, you must base your verdict on the law I give you in these instructions."

22

¶134 The jury struggled to discharge its duty. It agonized over its decision. For the court now to say that two critical errors at trial were harmless in their effect on the jury is to deny reality and forget our purpose as a reviewing court.

¶135 Because I believe the defendant must be given a new trial, I respectfully dissent.

¶136 I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.